## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAUNTAY ARMSTEAD, | : | CIVIL ACTION NO. 3:12-CV-2452 |
| | : | |
| Plaintiff | : | (Magistrate Judge Blewitt) |
| | : | |
| v. | : | |
| | : | |
| EXECUTIVE CLEANING & SUPPLY, | : | |
| INC, *et al.*, | : | |
| | : | |
| Defendants | : | |
| | : | |

### MEMORANDUM AND ORDER

### I.    Background.

On December 7, 2012, Plaintiff Shauntay Armstead, residing in Hazleton, Pennsylvania, brought this action in the United States District Court for the Middle District of Pennsylvania against Defendant Executive Cleaning & Supply, Inc. ("Executive Cleaning"), Defendant Scott "Houston,"[1] Defendant Shannon Doe (last name unknown), and Defendant Lorraine Doe.[2]    Plaintiff is represented by counsel.    Plaintiff had previously filed a claim with the Pennsylvania Human Relations Commission ("PHRC") prior to filing the current action.

Plaintiff states that she became employed by Executive Cleaning in or about July 2008 as a cleaning person.  (*Id.*, p. 4).  Plaintiff was assigned to perform cleaning services at E & B Giftware, a client of Executive Cleaning, on or about September 2008.  (*Id.*).  Plaintiff avers that on or about

---

[1]Defendant "Houston" is properly spelled "Huston." *See* Doc. 25-4 & Doc. 30-1, p. 3. We shall use the correct spelling of Defendant Huston's name herein.

[2]Defendant Lorraine Doe was identified as "Lorraine Shenyo." *See* Doc. 25-2 & Doc. 30-1, p. 3. Also, the record indicates that Defendant Shannon Doe was a man who was identified as "Shannon Cara." *See* Doc. 25-1 & Doc. 30-1, p. 3.

March and April 2009, she reported to Defendant Shannon and then to Defendant Lorraine that she felt harassed and was being treated differently because of her race while assigned to work at E & B Giftware.  (*Id.*).  Plaintiff also claims she complained to Defendant Huston at an unspecified time and requested to be transferred out of E & B Giftware because she was being discriminated against.  (*Id.*, p. 5).  Plaintiff states that Defendant Huston refused to transfer or remove her because Executive Cleaning could not afford to lose the contract with E & B Giftware.  (*Id.*).  Finally, Plaintiff contends that shortly after complaining to Defendant Huston about the discrimination, Plaintiff was terminated by Executive Cleaning on or about "May 13, 2009."[3]  (*Id.*).  Plaintiff claims she "was discharged as a direct consequence of her discrimination complaints and reports."  (*Id.*).

As stated, Plaintiff alleges that the staff at E & B Giftware harassed her and discriminated against her due to her race and that Defendants retaliated against her by terminating her shortly after her complaints about the discrimination.  Specifically, in Count I of her Complaint, Plaintiff alleges that Defendant Executive Cleaning retaliated against her "for exercising her rights under Title VII in violation ... of the Civil Rights Act of 1964 and 1991, as amended, and 42 U.S.C. §2000e[,] *et seq.*" (Doc. 1, p. 6).  In Count II of her Complaint, Plaintiff alleges that Defendant Executive Cleaning's unlawful actions "constitute a violation of Title 43 Pa. Stat. Ann. § 951[,] *et seq.*[,] of the Pennsylvania Human Relations Act."  Plaintiff avers that Defendant Executive Cleaning treated her "in a retaliatory and discriminatory manner solely because of [her] race" and that all Defendants fostered and perpetuated " a hostile and offensive work environment, retaliat[ed] against her because of her expressed opposition to offensive racially related conduct in the work place,

---

[3]The actual date of Plaintiff's termination from Executive Cleaning was May 12, 2009.

subjecting [her] to more onerous working conditions and treating [her] in a disparate manner." (*Id.*, p. 7). Thus, Count I, Title VII retaliation, and Count II, hostile work environment and retaliation under the PHRA, are asserted against only Defendant Executive Cleaning.

In Count III of her Complaint, Plaintiff raises an aiding and abetting claim under the PHRA against the three individual Defendants, Huston, Lorraine Shenyo and Shannon Cara, and she alleges "[t]he unlawful actions of the individual Defendants acting as aforesaid, constitutes an aiding and abetting violation pursuant to Title 43 Pa. Stat. Ann. §951[,] *et seq.*[,] of the Pennsylvania Human Relations Act." Plaintiff also avers that the individual Defendants, as her supervisors, "are personally liable pursuant to the [PHRA] for aiding and abetting the unlawful race discrimination and retaliation" alleged in her Complaint. (*Id.*, p. 8).

Thus, Plaintiff alleges that Defendants, who were her employer and supervisors, were aware of the racial discrimination and harassment against her at E & B Giftware and, that Defendants retaliated against her for complaining about it. In particular, Plaintiff alleges that soon after she complained about the discrimination at E & B to Defendants, she was terminated by Defendant Executive Cleaning. Plaintiff claims that as a result of Defendants' alleged conduct, "Plaintiff has suffered damages due to pain, suffering, mental anguish, fear, anxiety, sleeplessness, humiliation and severe emotional, psychological and physical stress." (*Id.*, p. 5).

As relief in her Complaint, Plaintiff requests damages due to the loss of income, benefits and earnings in excess of $100,000, due to Defendants' alleged discriminatory actions. (*Id.*, p. 6). Further, Plaintiff requests damages due to loss of future income, benefits, earnings and earnings capacity in excess of $100,000 due to Defendants' alleged discriminatory and retaliatory actions.

(*Id*.).  Plaintiff also requests punitive damages.  (*Id*.).  Additionally, Plaintiff requests declaratory and injunctive relief.  (*Id*., pp. 8-9).

On June 2, 2014, after the close of discovery, Defendants jointly filed a Motion for Summary Judgment under Rule 56 with respect to all of Plaintiff's claims.  **(Doc. 24)**.  Defendants simultaneously filed a Statement of Material Facts ("SMF") in accordance with Local Rule 56.1, M.D. Pa.  (Doc. 25).  Defendants attached Exhibits to their SMF which include the deposition transcripts of Plaintiff Shauntay Armstead, Defendant Lorraine Shenyo, and Defendant Scott Huston, as well as a March 2012 Statement by Scott Huston, President of Executive Cleaning, to the Pennsylvania Human Relations Commission ("PHRC").  (Docs. 25-1 to 25-4, respectively).  In his Statement to the PHRC, Defendant Scott Huston states that only Plaintiff was removed at the request of a client of Defendant Executive Cleaning during May 13, 2007 and May 13, 2009.  On June 19, 2014, after being granted an extension of time, Defendants filed their support brief along with an Exhibit, namely, a copy of Plaintiff's Complaint she filed against Defendant Executive Cleaning with the PHRC.  (Docs. 28 & 29).  On June 30, 2014, Plaintiff filed her opposition brief and answer to Defendants' SMF with one attached Exhibit (Defendants' Answer to Plaintiff 's Interrogatories).  (Docs. 30, 30-1 & 31).  Defendants filed a reply brief on July 17, 2014.  (Doc. 34). As such, Defendants' Motion for Summary Judgment is ripe for review.[4]

Plaintiff correctly asserts that this Court has federal question jurisdiction over her case pursuant to 28 U.S.C. §1331, as the case is substantively based on 42 U.S.C. §2000e, *et seq*.

---

[4]The parties have consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

Plaintiff also requests this Court to invoke its supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, to consider her state law claims arising under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S.A. §951, *et seq.*

## II.  Motion for Summary Judgment Standard.

In *Allen v. Fletcher*, 2009 WL 1542767, *2 (M.D. Pa.), the Court outlined the applicable standard to apply when considering a summary judgment motion as follows:

> Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
>
> Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*
>
> Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
>
> All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse*

> *Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson,* 477 U.S. at 256-57.

> The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Material facts" are those which might affect the outcome of the suit. *Justofin v. Metropolitan Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004).

## III.   Material Facts.

We consider the following material facts with respect to Plaintiff's discrimination, harassment, and retaliation claims under Title VII and the Pennsylvania Human Relations Act. Further, we consider material facts as they relate to Plaintiff's aiding and abetting claim against the three individual Defendants under the Pennsylvania Human Relations Act.

Plaintiff began employment with Defendant Executive Cleaning in July 2008 and she was assigned by Defendant to E & B Giftware (a client of Executive Cleaning)  in September of 2008 to perform cleaning services.[5] (Doc. 25-1, pp. 24 & 34 & Doc. 29).  As an employee of Executive Cleaning, Plaintiff's job duties included sweeping, mopping, wiping tables, cleaning bathrooms, and vacuuming.  (Doc. 25-1, p. 24).  Plaintiff complains of a number of incidents where she alleges that

---

[5]We note that "E & B Giftware" is spelled in a variety of ways throughout the briefs and Exhibits offered by the parties.  To remain consistent, we will refer to "E & B Giftware" as "E & B."

6

she was being treated in a discriminatory fashion by E & B. Plaintiff also claims that after she

complained to her  Executive Cleaning supervisors Defendants Shannon Cara, and Defendant

Lorraine Shenyo in February 2009 and March 2009, respectively, about being treated differently

and about being subjected to harassment at E & B due to her African-American race she was

discharged by Executive Cleaning owner Defendant Scott Huston on May 12, 2009.  (Doc. 29).

First, Plaintiff claims she was being treated unfairly as it relates to where she was parking

when working at E & B.  (Doc. 25-1, pp. 35-37).  Plaintiff testified in her deposition:

> Q.    Okay.  Now, Ms. Arnstead, do you recall having any type of problem or dispute with E & B Giftware as it relates to parking?
>
> A.    Yes.
>
> Q.    And what was that?
>
> A.    Um, there was (sic) several occasions that there was (sic) I guess issues with where I was parking.  First – the first one was, um, I guess where I was parking next to the door that I left that night, they [E&B personnel] didn't want me parking there.  I'm not sure why.  So then I changed my parking space.
>
> And then there was an issue that they wanted me to enter through the back door where the trucks enter, so I parked in the back.  And then he told me that I couldn't park my truck back there because of insurance reasons.
>
> So then I called them and I told them – I called Executive Cleaning and I let them know like where was I supposed to park.  I wasn't sure what was going on.  And then he told me that he wanted me to park in the front and walk to the back to enter around the warehouse, which is maybe about a half a mile from where I would park to where I would enter through the back door.
>
> Q.    A half a mile?
>
> A.    Yeah, around the warehouse, yeah.

Q.      Okay.  And is that how you continued to walk to get into the place
        [E&B] until you left the employment?

A.      No, I didn't do that because I explained to them that there's trucks
        driving around there and it's nighttime, because it was fall so it would
        get dark at 4:00, 5:00.  So if I'm checking in that time it's dark, and
        I'm not going to walk around a warehouse to enter through a back
        door.

Q.      Why do you believe that they were asking you to take that route to
        get into the building?

A.      I'm not sure, but I was the only one that they were telling to do that
        to.

Q.      Did you ask them why there were – did you ask them why they were
        requiring you to do that?

A.      The supervisor at E&B, he just would say, oh, it's because of insurance
        purposes or you people don't know where to park.  Like just random,
        um, answers he would give me when I asked him where I should park
        or why I couldn't park there.

Additionally, Defendant Lorraine Shenyo testified that she had heard from Plaintiff's

supervisor Defendant Shannon Cara that E & B was  complaining about Plaintiff using the

computers and phones at E & B during her work hours and Shenyo thought that E & B

staff had called the owner of Executive Cleaning about this matter.  (Doc. 25-2, p. 13).

With respect to the parking dispute between Plaintiff and E & B, Defendant Shenyo testified

at her deposition:

Q.      Go ahead.

A.      And I think they may have even called but I'm not sure.  I didn't hear
        that, but I'm sure that they might have called the owners about it too
        [regarding Plaintiff using the computers and phones at E & B during
        her work hours].

8

> And that the Claimant [Plaintiff] was parking in a no parking zone [at E & B], and she was asked not to park there and did again.

Q.   In a no parking zone?

A.   No parking zone.

Q.   Okay.  Did you ever have any conversations with Ms. Armstead about this parking issue?

A.   No.

(Doc. 25-2, p. 13).

Defendant Huston also testified about the progressive problems between Plaintiff

and E & B, and stated:

A.   Well, it started off with [Plaintiff] parking in the handicapped spots [at E & B], where she was told about that.  The supervisor addressed that issue with the thing.  And then it happened a second time where [Plaintiff] was still parking in [the handicapped spots] after she was told.  Then it progressed to the telephone [*i.e.*, Plaintiff using the phone to make personal calls during her work time with E & B], and then that's when I was made aware from E & B.  And then the final thing was [Plaintiff] being on their [E & B's] computers.

Q.   Do you have any idea how it came to be that your records reflect that the issue with parking [*i.e.*, Plaintiff parking at E & B] was parking in a no parking zone?

A.   Well, however they – it was stated.  It was a handicapped spot.  They don't actually have a no parking zone.

Q.   Okay.  So to the extent your records indicate it was a no parking zone, that would not be correct?

A.   Well, if you're not handicapped and you're parking, it's general knowledge that would be no parking.

Q.   Would you agree with me there's a difference between a handicapped zone and a no parking zone?

A.     Um...

Q.     One typically says no parking, one says handicapped?

A.     Right.

Q.     But your testimony is it was not a no parking zone, it was a handicapped zone?

A.     Right.

Q.     When, um – was it ever related to you that Ms. Armstead had complained that E&B had required her to park in a place that was so remote that it was approximately a half mile walk to the entrance point on the – in the warehouse?

A.     No.  And I can get you a site map.  There's nowhere – it's nowhere near even a half mile.

(Doc. 25-3, pp. 8-9).

Defendant Huston then described that the walk from the front of the warehouse at E & B, where Plaintiff was required to park, to the back of the warehouse, where Plaintiff entered the facility, was a five (5) minute walk.  (*Id.*, p. 9).  Further, Defendant Huston testified that he did not recall Plaintiff ever complaining about the walk being too long from where she was required to park at E & B  to where she entered the building.  (*Id.*).

After Plaintiff advised Defendant Lorraine Shenyo that E & B was making her park in the front of the facility and to walk around to the back of the warehouse to enter, Shenyo spoke to E & B personnel and they said Plaintiff could enter the front of the facility but she had to be there by a certain time, *i.e.*, by 3:55 or 3:50 p.m., so that E & B's staff could let her in the building. Plaintiff complains that E & B staff were discriminating against her due to E & B locking their doors at 4:00 p.m. and making her report for work earlier then her shift began.  Specifically, Plaintiff

10

testified:

> Q.   Okay.  With regards to the locking, when they [E&B] changed the policy with how they locked the doors, how is it that you felt that was treating you unfairly?
>
> A.   Because I just felt like they wanted to see – to make sure that I was like – to like – like – I felt like they just were like on me every move I made. Like they didn't do that to anybody – well, any of the other Executive Cleaning employees.
>
> Q.   With regards to the locks, wouldn't the door have been locked for anybody at around that 4:00 time when they would – when the locks would be in effect?
>
> A.   Yeah, but there was no shift.  There was nobody coming in at 4:00. The shift before that would get there about 3:30, and the other shift would be leaving at 3:30.  So I was the only one clocking in at 4:00. No other employees came in at 4:00, through those doors anyway.
>
> Q.   Well, how do you feel that was being unfair to you, though?
>
> A.   Because why wouldn't they lock the doors for everybody.  Why is the door only locked at 4:00 when I come.
>
> Q.   Did they tell you, though, just to come a little – a couple minutes early so that you could get in before they locked the doors?
>
> A.   Yeah, that's what I had to do or else I had to be knocking on windows, basically walking around the warehouse, which is what they wanted me to do, is what I would have had to do if I didn't come those couple minutes early.
>
> Q.   Are there times after you knew they were locking the doors at 4:00, that you would get there after 4:00?
>
> A.   Yes, because I had a small child at the time so you can't always pinpoint exactly how things are going to go, like anything could happen.

(Doc. 25-1, pp. 45-46).

Plaintiff further testified:

> Q.    Do you have any evidence that E&B instituted this policy of locking the doors at 4:00 because they wanted to make things difficult on you personally?
>
> A.    I don't have any evidence that they were specifically trying to make things difficult on me but they called Executive Cleaning and told them that they would be locking the doors at 4:00, so I had to get there before 4:00 or it was gonna be hard for me to get into the building.

(*Id.*, p. 57).

Plaintiff further testified that she was being treated unfairly as it related to her lunch break at E & B. Plaintiff stated the individual who trained her at E & B was there for approximately ten days and when he would take his lunch break, "he would sit on the couch and fall asleep for like an hour, an hour and 10 minutes and the supervisor would come in and not say anything." (*Id.*, p. 44). Plaintiff claims when she would take her lunch break though, the E & B supervisor "would come in like right as soon as I sat down and take my lunch and literally like hang out in there until I was done eating my lunch. Like the supervisor from E&B would hang out in the [café] area while I was eating my lunch." (*Id.*).

Plaintiff also testified:

> Q.    And what was wrong with that?
>
> A.    Because he [the supervisor from E&B] never did that to anybody else. Like seeing that I took exactly a half hour for lunch or whatever the case was.
>
> Q.    How long did you have for lunch?
>
> A.    A half hour.

(*Id*.).

Plaintiff further testified about how she was allegedly treated unfairly and discriminated against at E & B due to her race:

Q.   Explain to us what the situation was with them [E & B staff] asking you to mop the floor in the warehouse.

A.   The lady, Prudence, she was like a higher-up supervisor [at E & B], she would call me into the office one day. She's like, could you come over here for a second, and I was like, sure. And there was – there was maybe about five other ladies in the office and she's like, um, could you do me a favor? And I'm like, yeah. She was like, that office over there, because there was an office in the middle of the warehouse, she was like, could you mop that floor? I was like, mop the floor? I was like, I usually sweep it and if there's anything on the floor, pick it up. She was like, no, I want you to mop it and see how that works out. And then the other ladies started laughing. They're like, ha-ha, they told her to mop the floor and see how that works out.

And I just felt like she [Prudence] tried to like belittle me in front of all those people for whatever reason, because what they were trying to do through Executive Cleaning wasn't working. Like they didn't have any real complaints to Executive Cleaning so they were trying to like break me down other ways is how I felt.

Q.   What do you mean they didn't have any other complaints to Executive Cleaning?

A.   Like whatever they were – when they [E & B staff] were calling to Executive Cleaning and saying, oh, well, can't she do it from the back to the front. I did it. Oh, can't she do this? I did it. I didn't give them no issues unless it was issues of my safety like walking around the building. I wasn't gonna do that. So I just – and trying to say that I was using my cell phone. Like they were just trying to pick at me for issues that they didn't win, so I just felt like then they [E & B staff] tried to look for other ways.

Q.   When you were asked, I guess it was by Prudence, to mop the floor, the warehouse floor, did you try to mop it?

13

A.      No.  I called Lorraine [Shenyo] five minutes later and I was basically in tears telling – like she would have left for the day already so I just left a voice mail and just asked her to call me right away, because I told them when they trained me nobody mopped that floor, so why all of a sudden do I have to mop the floor.

Q.      So you refused to do it then; is that correct?

A.      Yeah, I didn't do it that day, no.

(*Id.*, pp. 46-48).

Defendant Lorraine Shenyo also testified regarding the mopping issue, stating:

Q.      Did you ever have occasion to talk to Ms. Armstead on the phone about any complaints she had about working at E&B?

A.      The only thing that I know of is she called, they [E&B staff] wanted her to mop a cement floor that was like cement.

Q.      Um-hmm.

A.      And that she told them she wasn't going to do it, I believe, that she couldn't do it, it was too hard.

Q.      How did you learn that?

A.      She told me that.

Q.      Is it possible what she told you that it wasn't possible as opposed to too hard?

ATTORNEY GALLAGHER:    Let me just object to the form.

THE WITNESS:                        She just said it was – she didn't want to do it.  I never saw the site so I didn't know if it was – what the reason was.  I told – I think I told her to talk to the supervisor [Defendant Shannon Doe], because running a sweeper and mopping and dusting are part of the

14

cleaning.

(Doc. 25-2, pp. 10-11).

Defendant Huston also testified about an issue as it relates to Plaintiff's usage of E&B's

phone.  Specifically, Defendant Huston stated:

> Q.     Tell me about the phone issue.  What was that all about?
>
> A.     Well, that she was using the phone at the [E&B] facility.  And then usually what my role is, is that, of course, I know that they have to use it for the time keeping.  Then my first question to the client or customer, whatever you want to refer to them as, is what time were they observed.  And based on the time keeping system, if it's not during when they would have been clocking in or out, then they're using it for personal use.
>
> Q.     And what was reported to you about Ms. Armstead on the phone?
>
> A.     Well, it ended up being for personal use.
>
> Q.     How did you determine that?
>
> A.     Well, based on the time that she clocked in or clocked out.  It was somewhere in the – about halfway through the time, so it would have been for personal use.

(Doc. 25-3, p. 8).

Defendant Huston also testified about an issue regarding Plaintiff's use of

E&B's computer while on the premises.  Defendant Huston testified:

> Q.     Now, Ms. Armstead has testified that the person who trained her showed her a specific computer and told her if she ever needed to use it she was allowed to use that one.  Do you know if that's true or not?
>
> A.     No, that's never been part of our training or anything in there.  There's no purpose to be on that computer in a facility.  In 16 years of time I've never had one issue with somebody being on a computer

15

except this one.

Q.     Okay.  Did you – in terminating Ms. Armstead did you say, I can't risk losing a client?

A.     Yes.

Q.     Were those your words or were they just –

A.     No, probably very similar to that.

Q.     Why did you think you might lose E&B as a client?

A.     Well, if I – just to throw this out there, if my cleaning people were in your office  and you came in and they were on your computer, you have no idea if they're accessing personal files, information that's pertinent to the operation as far as trade secrets and stuff like that. That's big.

Q.     Did anybody from E&B every tell you – ever say that to you, look, you're on thin ice here or words to that effect?

A.     No.

Q.     So this was a precautionary measure on your part?

A.     Well, it was a progression of breaking rules that should be followed.

(Doc. 25-3, p. 12).

   In fact, Plaintiff admitted she had used the E&B computers, stating:

Q.     So can you give us a date then why this supervisor from E&B told you that you can't play games on the computer?

A.     This was probably – it was after the new year, maybe in like March or April [2009], around there.

Q.     Did you ever access any of their [E&B's] computers?

A.     Um, once or twice when I was initially being trained the guy was telling me, well, if you need to use this computer, but I really – I didn't

need to use the computer.

Q.      You said "once or twice." What does that mean?

A.      When I was being trained, the guy that trained me, he used to be on the computer all the time.  And he's like, if you ever need to use it. I was like, I don't think I need to use the computer to clean so.

(Doc. 25-1, pp. 39-40).

Defendant Huston summarized the three incidents at E&B during Plaintiff's employment with Executive Cleaning that lead to her discharge, stating:

Q.      After the use of the phone issue, was that the same time as the use of the computer issue?

A.      It was shortly before – the computer was the final thing.  The progression was the parking in the handicapped spots, which was addressed by the supervisor; then the phone thing, which was addressed by me; and then the computer thing was the final straw. And that's where the whole – I believe there was something in there stating about losing the customer or something like that.  Well, that was the reference to losing the customer is based on the computer use.

(Doc. 25-3, p. 11).

Plaintiff also indicated she made a number of complaints to Defendant Executive Cleaning and to Defendant supervisors regarding her alleged unfair treatment at E&B.  Plaintiff stated she first made a complaint to Defendant Shannon Cara, her supervisor, in October 2008, but that Shannon failed to take any action on her behalf.  Plaintiff was unable to recall specifically what her initial complaint to Defendant Shannon Cara was about. However, Plaintiff then admitted  that she did not initiate making a complaint to Defendant Shannon Cara, rather, somebody from E&B complained about her to Shannon.  Plaintiff did not recall what the issue was and, she testified that

17

after she told Defendant Shannon her side of the story, Shannon told her not to worry about it. (Doc. 25-1, pp. 52-53).  Plaintiff also stated that Defendant Shannon told her "if there's any issues, [E&B staff will] call us and we'll let you know."  Plaintiff said "okay" and then did not complain to Defendant Shannon about any other conduct or actions at E&B which she felt were unfair.  (Doc. 25-1, pp. 53-54).

Plaintiff stated that she then started calling Defendant Lorraine Shenyo about her further complaints regarding her alleged unfair treatment at E&B since Defendant Shannon Cara was not doing anything about them. Plaintiff stated that she called Defendant Lorraine Shenyo at least four times.  (*Id.*, pp. 51-54, 58).  Plaintiff was unable to recall exactly what her complaint was about regarding her first three calls to Defendant Lorraine Shenyo.  (*Id.*, pp. 58-60).

The fourth time Plaintiff called Defendant Lorraine to complain about alleged unfair treatment at E&B was in May 2009, and it was over the mopping incident when E&B supervisor Prudence told her to mop cement floors.  Plaintiff stated that Defendant Lorraine Shenyo told her "that's not right because we didn't train you to do that.  Those offices [at E&B] were supposed to be just swept and garbage taken out." (*Id.*).

Although Plaintiff stated she was unable to remember the specifics of the phone calls to either Defendant Shannon Cara or Defendant Lorraine Shenyo, Plaintiff testified:

Q.    On these four occasions that you contacted Lorraine, at any time did you tell her that you thought you were being treated differently [at E&B] because of your race?

A.    Yes, I did, at least on two of those phone – at least twice I told her [Lorraine Shenyo] that I felt like they [E&B staff] were discriminating against me or treating me unfairly because I was black.

18

(*Id.*, p. 61).

Plaintiff stated that she definitely told Defendant Lorraine Shenyo in her last phone call that she thought she was being treated unfairly at E&B due to her race, and that she asked Lorraine if she could switch to a different work site.  Plaintiff further stated that after she requested a transfer to a different site, Lorraine told her that no other site was currently available.  (*Id.*, p. 62).

Plaintiff stated no racial slurs were ever directed towards her at E&B or by Defendants.  (*Id.*, p. 51).

Plaintiff concluded her testimony by stating:

Q.    As you sit – finally, we'll wrap this up.  As you sit here today, do you have any facts to back up your allegation that you were treated unfairly at E&B Giftware because of your color or race?

A.    No, just the phone calls that I spoke with them about, that I spoke with Executive Cleaning about, the complaints, and just the last phone call with Scott [Huston].

(*Id.*, p. 79).

Finally, Defendant Huston stated that based on the complaints E&B made about Plaintiff, and the three events about which he testified (*i.e.*, parking, phone and computer) he terminated Plaintiff *via* telephone on May 12, 2009.  (*Id.*, p. 73 & Doc. 25-2, pp. 15-16).

## IV.    Discussion.

As previously stated, Plaintiff has sued Defendant Executive Cleaning for retaliation in violation of Title VII and the Pennsylvania Human Relations Act.  Further, Plaintiff has sued individual Defendants Scott Huston, Shannon Cara, and Lorraine Shenyo for aiding and abetting under the Pennsylvania Human Relations Act.  Defendants argue that Scott Huston, Shannon Cara,

and Lorraine Shenyo cannot be held liable under the PHRA for aiding and abetting.

As Defendants point out in their reply brief (Doc. 34, p. 4), Plaintiff did not oppose Defendants Lorraine Shenyo and Shannon Cara from being dismissed in this case.  (Doc. 30, p. 15 n. 4).  It appears that once discovery was completed, it was revealed that Defendant Lorraine Shenyo was not a supervisor at Executive Cleaning , rather she worked as a secretary administrator. (Doc. 25-2, p. 6).  Also, as Defendants point out, "Lorraine Shenyo made a number of references in the record that others [at Executive Cleaning] were supervisors, and not her.  (Exhibit B [Doc. 25-2] [NT] 16, 18, 22, 23, 29, 33, 37, 40, 43, 53, 56 & 57)."  (Doc. 25, p. 8 ¶ 29).  Further, in their reply brief, Defendants correctly state that "there is no evidence that either [Lorraine Shenyo or Shannon Cara] held sufficient supervisory authority or engage in any retaliatory conduct against Plaintiff ... ."  (Doc. 34, p. 4).

Thus, we will grant summary judgment in the favor of Defendants Lorraine Shenyo and Shannon Cara. Therefore, Plaintiff's  aiding and abetting claim under the PHRA shall only be addressed as against Defendant Scott Huston.

We first discuss Plaintiff's sole federal claim which is her retaliation claim under Title VII against Defendant Executive Cleaning.   As stated above, Plaintiff also raises claims against Defendant Executive Cleaning identical to her Title VII claim under the PHRA.[6]   (Doc. 1, p. 7).

---

[6]As the parties correctly recognize, the analysis of Plaintiff's Title VII claim applies equally to Plaintiff's PHRA claims.  *See Rozic v. Trinity Industries, Inc.*, 47 Fed. Appx. 151, 152, 2002 WL 31151322 , **1 (3d Cir. Pa.); *Davis v. Tammac Corp.* 127 F. Supp. 2d 625, 629, n. 6  (M.D. Pa. 2000) ("Claims brought under the PHRA are analyzed under the same standards as their federal counterparts." (citations omitted)); *Thimons v. PNC Bank, N.A.*, 254 Fed. Appx. 896, 897 n. 1 (3d Cir. 2007).

Title VII "prohibits employers from discriminating against individuals on the basis of their race, color, religion, sex, or national origin." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 n. 7 (3d Cir. 2013)(citing 42 U.S.C. §20002-2(a)(2)).

As discussed, Plaintiff alleges that Defendant Executive Cleaning terminated her shortly after she complained to its personnel that she was being harassed and discriminated against by E&B staff due to her race.  There is no claim by Plaintiff that any of the personnel of Defendant Executive Cleaning harassed her and discriminated against her due to her race, and no such evidence was presented.  Defendants essentially argue that Executive Cleaning cannot be held liable under Title VII for the alleged racial harassment and discrimination against  its employee Plaintiff since this conduct was attributable to a third party client of Executive Cleaning and not to its personnel.  Defendants also contend that Plaintiff cannot show E&B was a co-employer with Executive Cleaning.

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

Thus, as both Plaintiff and Defendants recognize, with regards to Plaintiff's Title VII retaliation claim against Defendant Executive Cleaning, Plaintiff must show that she was engaged in a protected activity, that an adverse employment action was taken against her in response to the exercise of a protected activity, and that a causal link exists between the

21

protected activity and the adverse employment action.  *See Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 279 (3d Cir. 2000).

Plaintiff raises a claim of retaliatory firing for opposing racial harassment and discrimination by E&B staff under Title VII. In Count I of her Complaint, Plaintiff alleges that she complained to Defendants about racial harassment and discrimination while she was assigned by Defendant Executive Cleaning to work at its client E&B in 2008-2009, and that Executive Cleaning, through Defendant Huston, terminated her in May 2009, due to her complaints of discrimination in the workplace.   (Doc. 1, p. 6).  Plaintiff points out that when Defendant Huston terminated her shortly after her complaints about E&B, he undisputedly told her that he could not risk losing E&B as a client. (Doc. 25-3, p. 12).  Defendants argue that Plaintiff cannot establish a prima facie case of Tile VII retaliation since Executive Cleaning cannot be held liable for the alleged racial discrimination by its third party client, E&B.

In *McCloud v. United Parcel Service, Inc*., 543 F.Supp.2d 391, 401(E.D.Pa.2008)(footnote omitted), the Court stated:

> Title VII and the PHRA make it unlawful for an employer to discriminate against an employee who has opposed practices made illegal by Title VII or the PHRA, or because he participated in an investigation or proceeding under those statutes. *Id.* Claims of unlawful retaliation under Title VII are analyzed under the burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that standard, to succeed on his claim of unlawful retaliation, Plaintiff must first demonstrate: (1) he engaged in an activity protected by Title VII; (2) after or contemporaneous with engaging in that conduct, his employer took an adverse action against him; (3) the adverse action was "materially adverse"; and (4) a causal link exists between his participation in the protected activity and the employer's adverse action. *See Hare v. Potter,* 220 Fed.Appx. 120, 127 (3d Cir.2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405,

2415, 165 L.Ed.2d 345 (2006)). To satisfy the third, "material adversity," prong, Plaintiff must prove that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 128. If Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendant to advance a legitimate, nonretaliatory or nondiscriminatory reason for its actions. *Id.* at 127. If Defendant has done so, the burden shifts back to Plaintiff to prove that the nonretaliatory or nondiscriminatory reason is merely a pretext for discrimination. *Id.*

Further, "Title VII's anti-retaliation provisions [42 U.S.C. §2000e-3] protect employees who oppose employment practices made illegal by Title VII." *Brangman v. Astrazeneca,* LP, 952 F.Supp.2d 710, 721 (E.D.Pa. 2013)(citation omitted).  "The Plaintiff must therefore be opposing employment practices made illegal by Title VII." *Id.*(citation omitted). Also, "case law has established that opposition to an illegal employment practice must identify the employer and the practice – if not specifically, at least by context." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).

In our case, Plaintiff's complaints about racial harassment and discrimination to the staff of Defendant Executive Cleaning concerned conduct of the employees of E&B, Defendant's client, and not employees of Executive Cleaning. (*See* Doc. 29). There is no evidence that Plaintiff complained about racial harassment and discrimination by the staff of Defendant Executive Cleaning.  (*Id*. & Doc. 25-1). However, Plaintiff did testify that she told Lorraine Shenyo in her last telephone call that she felt the staff of E&B were treated her differently due to her race, and she requested to be assigned to a different client of Executive Cleaning.  Plaintiff also stated that during her telephone call with Scott Huston on May 12, 2009, when Huston terminated her, she alleged that she was treated unfairly at E&B Giftware because of her race.

Defendants maintain that Executive Cleaning cannot be held liable to Plaintiff under Title VII since it did not directly engage in the alleged harassing and discriminatory conduct, rather its third party client did. (Doc. 28, pp. 10-11). Defendants argue that Plaintiff 's opposition to the alleged harassing and discriminatory conduct by E&B staff is not a protected act under Title VII since the discrimination cannot be attributed to Executive Cleaning and its staff.   Thus, Defendants state that "[t]he record lacks any evidence in support of the first prima facie element, protected activity by the Plaintiff."  (Doc. 28, p. 8).  Defendants contend that E&B was not a joint employer of Plaintiff and that "Plaintiff was assigned by Executive Cleaning a location to perform cleaning duties, though she was told at times where to clean on the premises and possible at what times to clean, the [E&B Giftware] did not control any material conditions of Plaintiff['s] employment." (Doc. 34, pp. 2-3).  In fact, Plaintiff  testified that when Prudence of E&B directed her to mop cement floors, she did not do so and called Lorraine Shenyo to complain about this incident. The evidence also shows that Plaintiff could be re-assigned to a different client of Executive Cleaning by only the staff of Executive Cleaning.  Executive Cleaning and its staff supervised Plaintiff's work and how Plaintiff interacted with E&B and its other clients.  Additionally, the evidence shows that Plaintiff could be terminated only by Executive Cleaning and that E&B  was not a joint employer of Plaintiff.

Nonetheless, we agree with Plaintiff that her opposition to the alleged harassing and discriminatory conduct by E&B staff, non-employees of Executive Cleaning, may constitute a protected act under Title VII since she presented evidence that Executive Cleaning and its staff knew of the alleged discriminatory conduct and failed to take corrective action.  In *Costenbader*

*v. Classic Design Homes, Inc.*, 2010 WL 597456, *3 (M.D.Pa. Feb. 16, 2010), the Court stated:

> Although the Court of Appeals for the Third Circuit has not addressed the
> question, lower courts in this circuit and other courts of appeal have held
> an employer liable for the sexual harassment of its employee by a non-
> employee " 'where the employer (or its agents or supervisory employees)
> knows or should have known of the conduct and fails to take immediate
> and appropriate corrective action.' " *Graves v. County of Dauphin*, 98
> F.Supp.2d 613, 620 (M.D.Pa.2000) (quoting 29 C.F.R. § 1604.11(e)
> (1997)). *Accord Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491
> F.Supp.2d 467, 476 (D.Del.2007) (compiling cases holding employers
> liable for harassment by non-employees).

*See also Gentile v. Des Properties, Inc.*, 2010 WL 597433, *4 (M.D.Pa. Feb. 16, 2010); *Guthrie*

*v. Baker*, 583 F.Supp.2d 668, 679 (W.D.Pa. 2008)("Although the Court of Appeals has not

specifically addressed the scenario of harassment by non-employees, a number of other courts

of appeals and district courts have followed the EEOC Guidelines and concluded that employers

can be held liable under the circumstances described therein, namely where the employer

knows or should have known of the conduct and fails to take immediate and appropriate

corrective action.")(citations omitted). The Court in *Guthrie v. Baker,* stated "[t]his theory of

liability is grounded not in the harassing act itself ... but rather in the employer's 'negligence and

ratification' of the harassment through its failure to take appropriate and reasonable responsive

action." *Id.*(quoting *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006)).

Moreover, "[a] general complaint of unfair treatment is insufficient to establish protected

activity under Tile VII." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450

F.3d at 135(citations omitted).  "[T]o succeed on a Title VII retaliation claim, an employee must

have an 'objectively reasonable' belief that the activity he opposes constitutes unlawful

discrimination under Title VII." *Ferra v. Potter*, 324 Fed.Appx. 189, 192 (3d Cir. 2009)(citation

omitted).  Thus, in order for our Plaintiff 's complaints about her treatment by E&B staff to constitute protected activity under Title VII, a reasonable person must believe that the conduct complained of violated Title VII.  *Id.*(citation omitted); *Barber v. CSX Distribution Servs*., 68 F.3d 694, 701-02 (3d Cir. 1995)(complaints about unfair treatment in general and expressions of dissatisfaction in the workplace "do[] not constitute the requisite 'protected conduct' for a *prima facie* case of retaliation.").

We find that our Plaintiff 's general complaints of unfair treatment by E&B staff twice to Lorraine Shenyo and once to Scott Huston were simply too vague as to why she felt this treatment was due to her race.  In light of Plaintiff 's testimony detailed above, we find that Plaintiff did not express an "objectively reasonable" belief that her described treatment by E&B staff constituted unlawful discrimination under Title VII. Plaintiff did not specifically explain to either Shenyo or Huston why she felt the treatment she was experiencing by E&B staff was based on her race.  In fact, as detailed above, incidents at issue, such as  the parking incident, affected anyone entering E&B and not just Plaintiff since the doors were locked at 4:00 p.m. We find that the undisputed evidence in this case is not sufficient to satisfy the requirements of protected activity under Title VII.

As indicated, Plaintiff admitted that she was unable to remember the specifics of her telephone calls to Defendant Lorraine Shenyo, who, as discussed above, was undisputedly not a supervisor at Executive Cleaning.  Plaintiff testified:

> Q.  On these four occasions that you contacted Lorraine, at any time did you tell her that you thought you were being treated differently [at E&B] because of your race?

26

> A.     Yes, I did, at least on two of those phone – at least twice I told her
>        [Lorraine Shenyo] that I felt like they [E&B staff] were discriminating
>        against me or treating me unfairly because I was black.

(Doc. 25-1, p. 61).

Additionally, Plaintiff testified about the May 12, 2009, termination call with Defendant

Huston and stated:

> Q.     As you sit – finally, we'll wrap this up.  As you sit here today, do you have
>        any facts to back up your allegation that you were treated unfairly at E&B
>        Giftware because of your color or race?

> A.     No, just the phone calls that I spoke with them about, that I spoke with
>        Executive Cleaning about, the complaints, and just the last phone call
>        with Scott [Huston].

(Doc. 25-1, p. 79).

We agree entirely with Defendants who state "Plaintiff's claim that she was being treated

unfairly because of her race [by E&B staff] because she had to mop a cement floor (cleaning was

one of her duties), which duty Plaintiff refused to do[,] learned that E&B [Giftware] changed

their policy on when they locked the door to get into their building for which [Plaintiff] admitted

she had no evidence that the E&B [Giftware] was trying to make things difficult on her, ... , and

that she had to park behind the building had no relations to her race." (Doc. 28, p. 12).   We

also agree with Defendants that "there is absolutely no evidence indicating [that E&B was

treating Plaintiff unfairly due to her race] and [Plaintiff's] complaints are not reasonably related

to her race."  (*Id.*).  Also, as stated, there was no connection to Plaintiff 's complaints about

unfair treatment by E&B staff to any conduct or practice by her employer, Executive Cleaning.

Based on our discussion of the evidence above, we find that our Plaintiff did not engage in protected opposition conduct. *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d at 135(citing *Dupont-Laurne*, 994 F.Supp. at 823 ("holding that employee's statement was too vague to constitute protected opposition activity where it did not apprize the employer of any practice viewed as discriminatory or accuse anyone at the employing company of engaging in discrimination."); *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012-13 (9th Cir. 1983)("it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice."); *Ferra v. Potter, supra*.

Since we find that Plaintiff failed to show protected activity within the meaning of Title VII, we do not address the issue of whether Plaintiff demonstrated a sufficient causal connection between her complaints about her treatment by E&B staff and her termination from Executive Cleaning in May 2009.  *See Ferra v. Potter, supra*.

Finally, we address Plaintiff's aiding and abetting claim under the PHRA remaining against only Defendant Scott Huston, co-owner and Vice President of Executive Cleaning. "Unlike Title VII, the PHRA provides that it is unlawful for any person or employer 'to aid, abet, incite, compel, or coerce' unlawful employment discrimination.  43 P.S. §955(e)." *Nelson v. Allan's Waste Water Service, Inc.*, 2013 WL 4045787, *4 (W.D.Pa. Aug. 8, 2013).  "Individual 'aiding and abetting liability' under the PHRA is limited to supervisors only." *Id.*(citation omitted).  We agree with Plaintiff that Defendant Huston is a supervisor under the PHRA.  *Id*. However, since we find that Plaintiff 's retaliation claim under Title VII against Defendant Executive Cleaning fails, there was no retaliation for individual Defendant Scott Huston to aid

28

and abet.  *See Kern v. Schuylkill I.U. 29*, 2010 WL 3632695, *10 (M.D.Pa. June 23, 2010)(citations omitted); *Stepp v. Fairpoint Communications, Inc.*, 2007 WL 4248559, *9 (W.D.Pa. Nov. 30, 2007)(Court found that since employer's conduct was not discriminatory or retaliatory, "there was no discrimination or retaliation for [supervisor] to aid and abet.")(citing *Kaniuka v. Good Shepherd Home*, 2006 WL 2380387, *10 (E.D.Pa. Aug. 15, 2006).

## V.      Conclusion.

Based on the foregoing, we will grant Defendants' Motion for Summary Judgment **(Doc. 24**) with respect to all of Plaintiff's claims. Since we shall enter Judgment for Defendants regarding Plaintiff's federal claim, we shall also enter Judgment with respect to Plaintiff's state law PHRA claims which are based on the same facts and legal theories as her federal claim.[7]

An appropriate Order will be issued.

**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: September 17, 2014**

---

[7]The Court also notes that it declines to exercise supplemental jurisdiction over Plaintiff's pendent state law PHRA claims since her federal claim (Title VII) will not be permitted to proceed.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130 (1966). *See also* 28 U.S.C. § 1367(c)(3); *Verdecchia v. Prozan,* 274 F.Supp.2d 712, 728 (W.D. Pa. 2003).